E-FILED
Thursday, 13 September, 2012  01:26:00 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| NAIROBI STEPHENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10-3025 |
| | ) | |
| C/O NEISLER[1], C/O LAWSON, | ) | |
| DR. OBAISI, NURSE CLEVENGER, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

Plaintiff proceeds pro se and is incarcerated in Logan Correctional Center. He pursues claims arising from injuries he sustained in a vehicle accident in March 2009. Defendants have filed motions for summary judgment. For the reasons below, the motions will be denied except as to Defendant Lawson.

## SUMMARY JUDGMENT STANDARD

---

[1]This Defendant's name is spelled "Nizler" in the Complaint, but according to this Defendant's pleadings, the correct spelling is "Neisler."

1

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material]  fact." Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists.  Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011).  "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment."  McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved

in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

## FACTS

The events occurred in Logan Correctional Center ("Logan"), where Plaintiff remains incarcerated.

Logan was on "level IV lockdown" on March 13, 2009, due to a prior staff assault.  The lockdown required officers to escort inmates to their job assignments.  Plaintiff was scheduled to work in dietary that day, so Defendant Correctional Officer Neisler handcuffed Plaintiff behind his back and escorted him to a van for transport to the dietary unit.  Plaintiff contends that a level IV lockdown did not require handcuffs during this escort.  He also contends that Defendant Neisler was not authorized to use the van but instead was supposed to walk inmates to their various locations.  However, these disputes are not material.  *See* Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006)("[T]his court has consistently held that '42 U.S.C. § 1983 protects

3

plaintiffs from constitutional violations, not violations of state laws or . . . departmental regulations and police practices.'")(quoted cite omitted).

Plaintiff was placed in the van along with several other inmates, his hands cuffed behind him.  According to Plaintiff, Plaintiff asked Neisler to buckle Plaintiff's seatbelt, but Neisler refused, stating that no seatbelt was needed because Plaintiff was only being transported around the corner.  (Pl.'s Dep. p. 8, d/e 48-1.)  Neisler denies that Plaintiff asked for his seatbelt to be fastened, but the Court accepts Plaintiff's version at this stage.  Plaintiff testified that Neisler drove the van around the premises at an "alarming speed," dropping inmates off at their various destinations.  Id.  Neisler "proceeded to back up at alarming speed to Housing Unit Nine where he met [Defendant] Officer Lawson and additional inmates . . . ."  (Pl.'s Dep. p. 8.)  Neisler then "made a U-turn, proceeded to drive toward division room at alarming speed.  And he dropped Officer Lawson off and the inmate for the visit.  He proceeded to drive around the whole facility at an alarming rate, came around, and he finally pulled up into the Heath Care Unit parking lot."  (Pl.'s Dep. p.

9, d/e 47-1.)  After dropping off an inmate at the health care unit, Neisler

backed out across a street, again at an "alarming" speed which Plaintiff

estimates at 35-40 miles per hour.  (Pl.'s Dep. p. 14.)  Speeding in

reverse at this pace for about 60 feet, the van came to an abrupt halt

upon hitting a light pole.  Id.  The impact bent the side of Plaintiff's seat,

caused Plaintiff's neck to snap back and forth, and caused his low back to

"pop."  (Pl.'s Dep. p. 14, d/e 47-1; Pl.'s Resp. p. 2, d/e 51.)  Plaintiff

immediately experienced neck and back pain but was told to go ahead to

his work station.

Defendant Dr. Obaisi saw Plaintiff on the day of the accident for

reports of neck and lower back pain.  Dr. Obaisi examined Plaintiff and

prescribed him Naprosyn and a one day "lay-in," which means an

exemption from work assignments and other physical activity.  (Pl.'s Dep.

p. 11, d/e 47-1.)

The next week Dr. Obaisi saw Plaintiff for a follow-up visit.  By this

time, Plaintiff was experiencing a sharp pain which traveled from his left

lower back, through his left buttock, and down the back of his left leg.

(Pl.'s Dep. p. 18, d/e 47-1.)  His "left heel would go numb, and it felt like a bunch of pins and needles."  Id.  Dr. Obaisi continued to prescribe pain medicine, lay-ins, and low bunk permits.

Plaintiff continued to experience pain.  On April 16, 2009, Dr. Obaisi ordered an x-ray, which states in pertinent part:

> IMPRESSION:
> 1.  No acute bony abnormality
> 2.  Mild scoliosis may be positional.
> 3. Soft tissue indistinct margin on the right may be artifactual.
> Please correlate clinically and image further if clinically indicated.

(4/23/09 radiology report, d/e 55-4.)

On May 26, 2009, Plaintiff experienced excruciating pain which caused him to fall to the ground.  He turned on his right side to reduce the pain and was taken by wheelchair to the health care unit, where he saw Dr. Obaisi later that afternoon. Dr. Obaisi renewed the pain medication and ordered another one-week lay-in.  Dr. Obaisi gave Plaintiff a steroid injection on June 30, 2009.

Plaintiff continued to experience what he describes as level 8 pain, sharp and excruciating, traveling down his left leg.  When his lay-in

6

expired in September, 2009, Plaintiff tried to lift a 50 pound bag at work
but could not because of the pain.  Plaintiff continued to seek health care
for the pain and asked repeatedly to be sent to an outside specialist.  Dr.
Obaisi continued to renew the pain medicines, muscle relaxants, lay- ins,
and low bunk permits.  Plaintiff lost about 30 pounds between March
and August 2009, from 260 pounds to 230 pounds.  He stands 6 feet, 1
inch tall, according to a 9/8/11 neurosurgery consult.  (Pl.'s Ex. 105, d/e
58-4.)

In December, 2009, Dr. Obaisi ordered another x-ray, which
revealed no fractures but did note "mild scoliosis of the lumbar spine
convex to the left."  (Dr. Obaisi Undisp. Fact 32, d/e 55.)  Once in 2008,
about one year before the accident, Plaintiff had injured his back lifting a
cooler, but apparently that injury had resolved without incident.  (Dr.
Obaisi Undisp. Fact 32, d/e 55.)

Plaintiff's pain and difficulty functioning continued.  In February,
2010, Dr. Obaisi discussed Plaintiff's case with another doctor, Dr.
Garcia, who approved sending Plaintiff for an MRI.  The MRI was done

the following month, its impression revealing:

> a small broad-based disc bulge or minimal broad-based disc
> protrusion at L4/L5.  This creates a mild spinal stenosis at this
> level.  There is a suggestion of some posterior displacement
> and slight impingement of the left L4 nerve root as it extends
> through the neural foramen on the left at L4/L5 as seen on
> sagittal image #1, on both T2 and T1 weighted.  This is not
> seen on the axial images and, therefore, a questionable
> finding.  Additional thin-section axial MR images through this
> area may prove useful or, this patient may benefit from a
> conventional myelogram and CT myelogram to evaluate for
> nerve root sleeve filling in this region.  There is a small central
> disc bulge with minimal protrusion at the L5/S1 level without
> spinal stenosis.  L3/L4 is normal.

(3/10/10 radiology report, d/e 55-4, p. 40.)

Plaintiff continued to experience the same severe, sharp pain at a

level 8.  Some days the pain would lessen to a level 7, and Plaintiff might

be able to go about his normal routine.  However, other days Plaintiff

could only lie in bed with excruciating pain.  (Pl.'s Dep. p. 87-88, 92, d/e

47-1)("It has decreased.  Some days I'll feel like a seven.  But some days,

I just don't go—I don't even go to chow.  I'll just lay in the bed; I can't

even get out of the bed.  I just lay in the bed because the pain is more

excruciating."); id. at 92 ("Some days it's better.  Some days it's worse.").

Dr. Obaisi continued to prescribe pain medicines, lay-ins, back exercises, and low bunk permits.  According to Plaintiff, when the prescribed lay-ins expired Plaintiff had to work to avoid a disciplinary report until he was able to see the doctor and have the lay-in renewed. Plaintiff also contends that he was required to pay a $2 co-pay each time he needed to see a medical professional for his chronic pain.

In February, 2011, one year after Plaintiff's MRI, Dr. Obaisi spoke with Dr. Agrawal, who gave approval to send Plaintiff for an EMG study. (Dr. Obaisi's Aff. ¶ 50, d/e 55-1.)  An EMG is electromyography, a "test that checks the health of the muscles and nerves that control the muscles." www.nlm.nih.gov (a service of the U.S. National Library of Medicine National Institutes of Health)(last visited 9/10/12).

The EMG results read in relevant part:

EMG
EMG shows moderate to severe left LF +/- irritation and denervation with fibrillation in the paraspinous, tibialis anterior with diminished number of motor units and increased polyphasic potential.

9

CLINICAL IMPRESSION:
Posttraumatic LR-5 herniated disk with left L4 +/-
radiculopathy.

RECOMMENDATIONS:
A trial of epidural block and analgesics.  Three epidural blocks
can be tried to relieve the pain.

(Dr. Mehra report, d/e 55-4, p. 30.)

Two epidural blocks were tried.  The first did not relieve any of

Plaintiff's pain; the second relieved some pain for about six hours.  (Pl.'s

Dep. pp. 20, 92, d/e 47-1).

On or around July, 2011, a lumbar CT myelogram was conducted,

which showed a "[s]mall broad-based left posterolateral focal disc

protrusion at L4/5 resulting in mild left lateral recess stenosis."  (7/22/11

report, d/e 51-1, p. 22.)  Plaintiff continued to experience the same severe

pain and difficulty functioning.

By August, 2011, Plaintiff weighed 208 pounds, 52 pounds less

than when the accident occurred over two years earlier.  (8/3/11 medical

record, d/e 58-4.)  He was scheduled for a consult with a neurosurgeon on

September 8, 2011.  The surgeon, Dr. Fassett, recommended another

MRI and a follow-up appointment to discuss surgical options.  (IDOC

referral findings dated 9/8/11.)  Dr. Fassett's letter states:

> Mr. Stephenson presents with left lower extremity pain which
> has radicular characteristics.  His previous MRI scan shows
> some minor bulging at the L4-5 level that could possibly [sic]
> radicular irritation.  With his symptoms persisting, surgery
> may be an option to address his pain.  This would likely
> involve a laminar foraminotomy with possible diskectomy
> [sic].  Since his MRI scan is over one year old, I would like to
> obtain a new study prior to considering surgery.  I have
> requested that the prison obtain a new MRI scan and have
> the patient return to my officer to consider surgical options.

(9/8/11 letter from Dr. Fassett to Dr. Obaisi, Pl.'s Ex. 105, d/e 58-4.)

The new MRI confirmed the prior findings, with no significant

change.  (9/26/11 radiology report, Pl.'s Ex. 109B.)  In a follow-up letter

to Dr. Obaisi, Dr. Fassett wrote that Plaintiff had:

> multilevel disk degenerative changes with bugling [sic] over
> multiple levels . . . .  He has mild to moderate recess stenosis
> on the left. . . . There is some spondylotic changes noted on
> his MRI scan and is a possible etiology for his symptoms.
> Options for treatment were discussed.  He has failed what I
> would consider the best nonsurgical treatment option with
> epidural injections.  If surgery was performed I would
> recommend a lamino foraminotomy at the L4-L5 level to
> decompress the L4 and L5 nerve roots. . . .

(10/31/11 letter, Pl.'s Ex. 113b.)

Surgery was performed in December 2011. (12/14/11 medical record, Pl's Ex. 114a.) Plaintiff maintains that the surgery has restored his range of motion and relieved his pain. (Pl.'s Resp. p. 11, d/e 58.)

## ANALYSIS

I.  **Material disputes preclude summary judgment in favor of Correctional Officer Neisler, the driver of the van.**

Deliberate indifference is "proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012)(quoted cite omitted). Negligence is not deliberate indifference, nor could a negligence action proceed against Defendant Neisler in federal court. McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)(deliberate indifference is not negligence or gross negligence); 705 ILCS 505/8 (Illinois Court of Claims has exclusive jurisdiction over tort claims against the State).

Neisler correctly points out that an internal investigation found him only negligent. Plaintiff himself does not believe that Neisler intentionally rammed the van into the light pole. (Pl.'s Dep. p. 16.)

However, Neisler knew that Plaintiff was cuffed behind his back. According to Plaintiff, Neisler refused to buckle Plaintiff's seatbelt and backed up at an alarming rate of speed.  A layperson arguably knows, and a rational juror could find, that Neisler's actions put Plaintiff at a serious risk of harm, given that Plaintiff's handcuffs prevented him from steadying or bracing himself.  Summary judgment will be denied to Neisler.

## II.   No rational juror could find that Correctional Officer Lawson, a temporary passenger in the van, was deliberately indifferent.

Correctional Officer Lawson's only involvement was riding in the van for part of the trip.  Lawson was not in the van when Plaintiff asked to have his seatbelt fastened, and Lawson was not in the van when the accident occurred.  Lawson entered the van at housing unit nine and was dropped off immediately thereafter at the "division room."  (Pl.'s Dep. p. 8, d/e 47-1.)

Plaintiff testified that Neisler drove at an "alarming speed" while Lawson was in the van, but this is not enough to impose bystander liability on Lawson.  Bystander liability would arise in this situation only

13

if Lawson knew that Neisler would back up recklessly at a high rate of speed and had a realistic opportunity to prevent the behavior.  Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009)(bystander can be liable if he knows another officer in his presence is in the process of committing a constitutional violation and has a reasonable opportunity to prevent that violation).  Lawson was not even in the van when the accident occurred. No plausible inference arises that Lawson was deliberately indifferent to any substantial risk of harm to Plaintiff.

## III.   The Court cannot rule out a material dispute with regard to Nurse Clevenger's refusal to see Plaintiff on March 27, 2009.

Nurse Clevenger's involvement is limited to one day—March 27, 2009—when Clevenger "kicked Plaintiff out" of the health care unit, according to Plaintiff.  On this day Plaintiff was trying to perform his job and began experiencing severe lower back and leg pain.  Plaintiff alerted his supervisor, who cleared Plaintiff  to go immediately to the health care unit.  Once there, Plaintiff was told that he would be seen after the diabetic line finished.  According to Plaintiff, Nurse Clevenger walked past Plaintiff twice and then told officer Kutz to instruct Plaintiff to leave

14

and submit a sick call request.  Sick call was scheduled for five days later.

Plaintiff left and submitted a request as instructed.  He was able to see a

doctor on March 30, 2009, and received a prescription for Naprosyn that

day.  (3/30/09 medical record, d/e 51-1.)

Clevenger offers no affidavit, nor is Plaintiff's complete deposition

in the record.  With so little information, the Court cannot rule out an

inference that Clevenger was deliberately indifferent to Plaintiff's severe

pain.  Plaintiff's medical records would have alerted Clevenger that

Plaintiff had recently been in a vehicle crash and had reported radiating

back pain since that time.  Those records would have also alerted

Clevenger that Plaintiff's Naprosyn prescription ran out on March 27,

2009, the day Plaintiff came to see Clevenger.  Why didn't Clevenger

determine at that time if the prescription could be refilled or some other

pain medicine provided?  Did Clevenger even decide whether Plaintiff

had a serious need before turning Plaintiff away?  Too many questions

remain for Clevenger's motion for summary judgment to be granted.

## IV.   A rational juror could find that Dr. Obaisi's delays amounted to deliberate indifference to Plaintiff's serious medical need.

Deliberate indifference to a serious medical need violates the Eighth Amendment. Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012)(Eighth Amendment claim requires deliberate indifference to an objectively serious medical condition). Plaintiff's medical needs were objectively serious based on Plaintiff's own description of his pain and difficulty functioning. *See* Hayes v. Snyder, 546 F.3d 516, 522-23 (7th Cir. 2008)(a serious medical need includes "'the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'")(quoted cite omitted); Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996)("Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.").

Dr. Obaisi argues that he was not deliberately indifferent. The record does show that Dr. Obaisi provided substantial medical care to Plaintiff, responding to Plaintiff's complaints of pain with pain medicines, muscle relaxants, steroid injections, instructions on back exercises, orders for lay-ins and low bunks, x-rays, an EMG, a lumbar

16

myelogram, MRIs, outside consults, and eventually, surgery.  Some of Dr. Obaisi's evidence, if believed, also supports an inference that Plaintiff's pain was not as debilitating as Plaintiff describes.  A reasonable juror could find in Dr. Obaisi's favor.

However, reasonable inferences also arise in Plaintiff's favor. Nearly a year had elapsed before Plaintiff was sent for an MRI, despite Plaintiff's repeated complaints of severe pain, difficulty functioning, and weight loss.  Dr. Obaisi's own affidavit supports an inference that Plaintiff should have been sent for an MRI or other diagnostic tests within few months of the injury.  While Dr. Obaisi avers that Plaintiff's treatment has been "consistent with the standard of care" he also avers that:

> Most back pain goes away without treatment.  Back pain that does not respond to anti-inflammatory medications may be caused by a strained muscle or ligament.  And, even when a nerve is pinched, surgery may not be required.  It is common to postpone any advanced evaluation and treatment; unless a patient's back pain persists for more than a few months.

(Dr. Obaisi's Aff. ¶ 33, d/e 55-1.)  Under Dr. Obaisi's own standard,

Plaintiff should have been referred for more advanced "evaluation and treatment" a few months after the injury.

Another year long delay occurred from the date of the first MRI to the date Plaintiff was sent to have the EMG test done, even though the MRI revealed a bulging disk and even though Plaintiff continued to complain of severe pain and difficulty functioning.  Dr. Obaisi does not explain why he persisted in the same approach, which had already been proven unsuccessful over an extended period of time.  A physician's persistence in prescribing ineffective treatment, causing prolonged and unnecessary pain, violates the Eighth Amendment  Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005)("dogged[] persist[ence] in a course of treatment known to be ineffective" is an Eighth Amendment violation). Plaintiff's entire deposition is not in the record, but the parts that are in the record show that Plaintiff's level of pain was often a level 8 on a scale of 1 to 10 during this entire period, though some days the pain decreased to a 7, enough for him to go about his normal routine.  (Pl.'s Dep. p. 87-88, 92, d/e 47-1)("It has decreased.  Some days I'll feel like a seven.  But

some days, I just don't go—I don't even go to chow.  I'll just lay in the
bed; I can't even get out of the bed.  I just lay in the bed because the pain
is more excruciating.")("Some days it's better.  Some days it's worse.").

Dr. Obaisi argues that Plaintiff "has no verifying medical evidence .
. . to establish a detrimental effect from any delay . . . ."  (Dr. Obaisi's
Summ. J. Mot., p. 24, d/e 55.)  The Seventh Circuit in <u>Langston v.
Peters</u>, 100 F.3d 1235, 1240-41 (7th Cir. 1996), did state that "'[a]n
inmate who complains that delay in medical treatment rose to a
constitutional violation must place *verifying medical evidence* in the
record to establish the detrimental effect of delay in medical treatment to
succeed.'"  (emphasis in <u>Langston</u>)(quoted cite omitted).  However,
expert testimony is not necessarily required to establish a detrimental
effect.  A detrimental effect occurs when the delay "unnecessarily
prolong[s] and exacerbate[s]" pain.  <u>Williams v. Liefer</u>, 491 F.3d 710,
715 (7th Cir.2007).  "[A] delay in the provision of medical treatment for
painful conditions—even non-life-threatening conditions—can support a
deliberate-indifference claim, . . . , so long as the medical condition is

'sufficiently serious or painful.'" <u>Grieveson v. Anderson</u>, 538 F.3d 763, 779 (7th Cir. 2008)(quoted and other cites omitted).

Dr. Obaisi also argues that he cannot be held liable for the constitutional violations of others, but he does not explain how this general principle of law applies to the facts in this case.  The record shows that Dr. Obaisi was the one with the authority to initiate the process to have Plaintiff referred out for tests and treatment not available in the prison.  He does not contend otherwise.

IT IS THEREFORE ORDERED:

1) The motion for summary judgment by Defendants Neisler and Lawson is granted as to Defendant Lawson and denied as to Defendant Neisler (d/e 48).

2)  The motion for summary judgment by Defendant Clevenger is denied (d/e 47).

3)  The motion for summary judgment by Defendant Dr. Obaisi is denied (d/e 55).

4) Plaintiff's motion for a status report is denied as moot (d/e 66).

5) The clerk is directed to correct the spelling of Defendant Nizler's

20

name in the caption to "Myron Neisler."

6) The final pretrial conference set for October 29, 2012 is CANCELLED and re-scheduled for Monday, November 19, 2012 at 1:30 p.m.. Plaintiff shall appear by video conference. Defense counsel shall appear in person. The parties are directed to submit an agreed, proposed final pretrial order at least fourteen days before the final pretrial conference. Defendant bears the responsibility of preparing the proposed final pretrial order and mailing the proposed order to Plaintiff to allow Plaintiff sufficient time to review the order before the final pretrial conference. *See* CD-IL Local Rule 16.3.[2]

7) The clerk is directed to issue a writ to secure Plaintiff's video appearance at the final pretrial conference.

8) The proposed final pretrial order must include the names of all witnesses to be called at the trial and must indicate whether the witness will appear in person or by video conference. Nonparty witnesses who are detained in the IDOC will testify by video. Other nonparty witnesses

---

[2]The Local Rules are listed on this District's website: www.ilcd.uscourts.gov. A sample pretrial order is attached to those rules.

may appear by video at the Court's discretion.  The proposed pretrial order must also include the names and addresses of any witnesses for whom trial subpoenas are sought.  The parties are responsible for timely obtaining and serving any necessary subpoenas, as well as providing the necessary witness and mileage fees.  Fed. R. Civ. P. 45.

9) The Court will circulate proposed jury instructions, a statement of the case, and proposed voir dire questions prior to the final pretrial conference, for discussion at the final pretrial conference.  Proposed additional/alternate instructions and voir dire questions must be filed 14 days before the final pretrial conference.  The jury instructions, statement of the case, and voir dire questions will be finalized at the final pretrial conference, to the extent possible.

10) Within five business days before the final pretrial conference, the parties must file copies of all exhibits which they may seek to introduce at the trial, and a list of those exhibits. The exhibits should be marked. For example, Plaintiff should mark his exhibits as "Plaintiff's Ex. 1," "Plaintiff's Ex. 2," etc., for easy reference. The list of exhibits should list the number of the exhibit and a short description (for example, Plaintiff's Ex. 1: grievance dated 12/1/2001).

11) Motions in limine are to be filed by October 22, 2012.

12) Jury selection and the jury trial set for November 6, 2012 is CANCELLED and re-scheduled for December 4, 2012 at 9:00 a.m., on the Court's trailing trial calendar. The actual date for the jury selection and trial will be decided at the final pretrial conference. In light of the Court's busy trial calendar, the parties are reminded that they may consent to a trial before Magistrate Judge Cudmore. 28 U.S.C. § 636(c)(1)(parties may consent to a full-time Magistrate Judge conducting "any or all proceedings in a jury or nonjury civil matter). Consent is voluntary: the parties are "free to withhold consent without adverse substantive consequences." 28 U.S.C. § 636(c)(3).

13) After the final pretrial order is entered, the Clerk is directed to

issue the appropriate process to secure the personal appearance of

Plaintiff at the trial and the video appearances of the video witnesses at

the trial.

ENTERED: September 13, 2012

FOR THE COURT:

                       s/Sue E. Myerscough

                       SUE E. MYERSCOUGH
                       UNITED STATES DISTRICT JUDGE